# SUPREME COURT OF THE UNITED STATES

_____

No. 20A66

_____

DEMOCRATIC NATIONAL COMMITTEE, ET AL. *v.*
WISCONSIN STATE LEGISLATURE, ET AL.

ON APPLICATION TO VACATE STAY

[October 26, 2020]

JUSTICE KAVANAUGH, concurring in denial of application to vacate stay.

Approximately 30 States, including Wisconsin, require that absentee ballots be received by election day in order to be counted. Like most States, Wisconsin has retained that deadline for the November 2020 election, notwithstanding the COVID–19 pandemic. In advance of the November election, however, a Federal District Court in Wisconsin unilaterally changed the State's deadline for receipt of absentee ballots. Citing the pandemic, the court extended the deadline for receipt of absentee ballots by six days—from election day, November 3, to November 9, so long as the ballots are postmarked on or before election day, November 3.

The Seventh Circuit stayed the District Court's injunction, ruling that the District Court had violated this Court's precedents in two fundamental ways: first, by changing state election rules too close to an election; and second, by usurping the state legislature's authority to either keep or make changes to state election rules in light of the pandemic.

Applicants here ask that we vacate the Seventh Circuit's stay and reinstate the District Court's order extending the deadline for absentee ballots to be received in Wisconsin. The Court today denies the applications and maintains the Seventh Circuit's stay of the District Court's order. I agree with the Court's decision to deny the applications, and I write separately to explain why.

I

For three alternative and independent reasons, I conclude that the District Court's injunction was unwarranted.

*First*, the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents. This Court has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election—a principle often referred to as the *Purcell* principle. See *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*); see also *Merrill* v. *People First of Ala.*, *ante*, p. ___, (*Merrill II*); *Andino* v. *Middleton*, *ante*, p. ___; *Merrill* v. *People First of Ala.*, 591 U. S. ___ (2020) (*Merrill I*); *Clarno* v. *People Not Politicians*, 591 U. S. ___ (2020); *Little* v. *Reclaim Idaho*, 591 U. S. ___ (2020); *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ___ (2020) (*per curiam*) (*RNC*).

The Court's precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor. Lawmakers initially must make a host of difficult decisions about how best to structure and conduct the election. Then, thousands of state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards. And at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting.

Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences. If a court alters election laws near an election, election administrators must first understand the court's injunction,

then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes. It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent.

That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election. See *Purcell*, 549 U. S., at 4–5; *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 197 (2008) (plurality opinion). The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.

In this case, however, just six weeks before the November election and after absentee voting had already begun, the District Court ordered several changes to Wisconsin's election laws, including a change to Wisconsin's deadline for receipt of absentee ballots. Although the District Court's order was well intentioned and thorough, it nonetheless contravened this Court's longstanding precedents by usurping the proper role of the state legislature and rewriting state election laws in the period close to an election.

Applicants retort that the *Purcell* principle precludes an appellate court—such as the Seventh Circuit here—from overturning a district court's injunction of a state election

rule in the period close to an election. That argument defies common sense and would turn *Purcell* on its head. Correcting an erroneous lower court injunction of a state election rule cannot itself constitute a *Purcell* problem. Otherwise, appellate courts could never correct a late-breaking lower court injunction of a state election rule. That obviously is not the law. To be sure, it would be preferable if federal district courts did not contravene the *Purcell* principle by rewriting state election laws close to an election. But when they do, appellate courts must step in. See, *e.g., Andino*, *ante,* p. ___; *RNC,* 589 U. S., at ___ (slip op., at 3).

*Second*, even apart from the late timing, the District Court misapprehended the limited role of the federal courts in COVID–19 cases. This Court has consistently stated that the Constitution principally entrusts politically accountable state legislatures, not unelected federal judges, with the responsibility to address the health and safety of the people during the COVID–19 pandemic.

The COVID–19 pandemic has caused the deaths of more than 200,000 Americans, and it remains a serious threat, including in Wisconsin. The virus poses a particular risk to the elderly and to those with certain pre-existing conditions. But federal judges do not possess special expertise or competence about how best to balance the costs and benefits of potential policy responses to the pandemic, including with respect to elections. For that reason, this Court's cases during the pandemic have adhered to a basic jurisprudential principle: When state and local officials "'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Andino*, *ante*, at 2 (KAVANAUGH, J., concurring in grant of application for stay). It follows "that a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily 'should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public

health and is not accountable to the people.'" *Ibid.* (some internal quotation marks omitted). As the Seventh Circuit rightly explained, "the design of electoral procedures is a legislative task," including during the pandemic. *Democratic National Committee* v. *Bostelmann*, ___ F. 3d ___, ___ (Oct. 8, 2020).

Over the last seven months, this Court has stayed numerous federal district court injunctions that second-guessed state legislative judgments about whether to keep or make changes to election rules during the pandemic. See *Merrill II, ante*, p. ___; *Andino, ante*, p. ___; *Merrill I,* 591 U. S. ___; *Clarno,* 591 U. S. ___; *Little,* 591 U. S. ___; *RNC,* 589 U. S. ___.

To be sure, in light of the pandemic, some state legislatures have exercised their Article I, §4, authority over elections and have changed their election rules for the November 2020 election. Of particular relevance here, a few States such as Mississippi no longer require that absentee ballots be received before election day. See, *e.g.,* Miss. Code Ann. §23–15–637 (2020). Other States such as Vermont, by contrast, have decided not to make changes to their ordinary election-deadline rules, including to the election-day deadline for receipt of absentee ballots. See, *e.g.,* Vt. Stat. Ann., Tit. 17, §2543 (2020). The variation in state responses reflects our constitutional system of federalism. Different state legislatures may make different choices. Assessing the complicated tradeoffs involved in changing or retaining election deadlines, or other election rules, in light of public health conditions in a particular State is primarily the responsibility of state legislatures and falls outside the competence of federal courts.

Applicants respond that this principle of deference to state legislatures applies only when a state legislature has affirmatively made some changes, but not others, to the election code in light of COVID–19. And they say that Wis-

consin's legislature has not done so, unlike the South Carolina legislature in *Andino*, for example. But the Wisconsin State Legislature's decision *not* to modify its election rules in light of the pandemic is itself a policy judgment worthy of the same judicial deference that this Court afforded the South Carolina legislature in *Andino*, *ante*, p. ___. In short, state legislatures, not federal courts, primarily decide whether and how to adjust election rules in light of the pandemic.

*Third*, the District Court did not sufficiently appreciate the significance of election deadlines. This Court has long recognized that a State's reasonable deadlines for registering to vote, requesting absentee ballots, submitting absentee ballots, and voting in person generally raise no federal constitutional issues under the traditional *Anderson-Burdick* balancing test. See *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983); *Burdick* v. *Takushi*, 504 U. S. 428 (1992).

To state the obvious, a State cannot conduct an election without deadlines. It follows that the right to vote is not substantially burdened by a requirement that voters "act in a timely fashion if they wish to express their views in the voting booth." *Burdick*, 504 U. S., at 438. For the same reason, the right to vote is not substantially burdened by a requirement that voters act in a timely fashion if they wish to cast an *absentee ballot*. Either way, voters need to vote on time. A deadline is not unconstitutional merely because of voters' "own failure to take timely steps" to ensure their franchise. *Rosario* v. *Rockefeller*, 410 U. S. 752, 758 (1973). Voters who, for example, show up to vote at midnight after the polls close on election night do not have a right to demand that the State nonetheless count their votes. Voters who submit their absentee ballots after the State's deadline similarly do not have a right to demand that the State count their votes.

For important reasons, most States, including Wisconsin, require absentee ballots to be *received* by election day, not

just *mailed* by election day. Those States want to avoid the
chaos and suspicions of impropriety that can ensue if thou-
sands of absentee ballots flow in after election day and po-
tentially flip the results of an election. And those States
also want to be able to definitively announce the results of
the election on election night, or as soon as possible there-
after. Moreover, particularly in a Presidential election,
counting all the votes quickly can help the State promptly
resolve any disputes, address any need for recounts, and
begin the process of canvassing and certifying the election
results in an expeditious manner. See 3 U. S. C. §5. The
States are aware of the risks described by Professor Pildes:
"[L]ate-arriving ballots open up one of the greatest risks of
what might, in our era of hyperpolarized political parties
and existential politics, destabilize the election result. If
the apparent winner the morning after the election ends up
losing due to late-arriving ballots, charges of a rigged elec-
tion could explode." Pildes, How to Accommodate a Massive
Surge in Absentee Voting, U. Chi. L. Rev. Online (June 26,
2020) (online source archived at www.supremecourt.gov).
The "longer after Election Day any significant changes in
vote totals take place, the greater the risk that the losing
side will cry that the election has been stolen." *Ibid.*

One may disagree with a State's policy choice to require
that absentee ballots be received by election day. Indeed,
some States require only that absentee ballots be *mailed* by
election day. See, *e.g.,* W. Va. Code Ann. §3–3–5(g)(2)
(Lexis 2020). But the States requiring that absentee ballots
be received by election day do so for weighty reasons that
warrant judicial respect. Federal courts have no business
disregarding those state interests simply because the fed-
eral courts believe that later deadlines would be better.

That constitutional analysis of election deadlines still ap-
plies in the pandemic. After all, during the pandemic, a
State still cannot conduct an election without deadlines.
And the States that require absentee ballots to be received

by election day still have strong interests in avoiding suspicions of impropriety and announcing final results on or close to election night.

To be sure, more people are voting absentee during the pandemic. But the State of Wisconsin has repeatedly instructed voters to request and mail their ballots well ahead of time, and the State has taken numerous steps to accommodate the increased number of absentee ballots. Moreover, the State now has some experience to draw upon when administering an election during the pandemic. Wisconsin conducted primary elections in April and August, and has incorporated the lessons from those experiences into its extensive planning for the November election. See Wisconsin Elections Commission, April 7, 2020 Absentee Voting Report 24 (May 15, 2020) (online source archived at www.supremecourt.gov). And that planning has paid off so far: For the November election, more than a million Wisconsin voters have *already* voted by absentee ballot.

In attempting to justify the District Court's injunction, Applicants also rely on this Court's decision in April regarding the Wisconsin primary election. They claim that the Court there approved the District Court's change of the deadline for receipt of absentee ballots in the primary election, so long as the ballots were postmarked by election day. *RNC*, 589 U. S. ___. That assertion is incorrect. In that case, this Court explicitly stated that the District Court's last-minute extension of the deadline for receipt of absentee ballots was "not challenged in this Court." *Id.*, at ___ (slip op., at 1).

In sum, the District Court's injunction was unwarranted for three alternative and independent reasons: The District Court changed the state election laws too close to the election. It misapprehended the limited role of federal courts in COVID–19 cases. And it did not sufficiently appreciate

the significance of election deadlines.[1]

## II

The dissent rejects all three of the above conclusions and applies the ordinary *Anderson-Burdick* balancing test for analyzing state election rules. In the dissent's view, the District Court permissibly concluded that the benefits of the State's deadline for receipt of absentee ballots are outweighed by the burdens of the deadline on voters. In light of the three alternative and independent conclusions outlined above, I do not think that we may conduct that kind

—————

[1] A *federal court's* alteration of state election laws such as Wisconsin's differs in some respects from a *state court's* (or state agency's) alteration of state election laws. That said, under the U. S. Constitution, the state courts do not have a blank check to rewrite state election laws for federal elections. Article II expressly provides that the rules for Presidential elections are established by the States "in such Manner as the *Legislature* thereof may direct." §1, cl. 2 (emphasis added). The text of Article II means that "the clearly expressed intent of the legislature must prevail" and that a state court may not depart from the state election code enacted by the legislature. *Bush* v. *Gore*, 531 U. S. 98, 120 (2000) (Rehnquist, C. J., concurring); see *Bush* v. *Palm Beach County Canvassing Bd.*, 531 U. S. 70, 76–78 (2000) (*per curiam*); *McPherson* v. *Blacker*, 146 U. S. 1, 25 (1892). In a Presidential election, in other words, a state court's "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush* v. *Gore*, 531 U. S., at 113 (Rehnquist, C. J., concurring). As Chief Justice Rehnquist explained in *Bush* v. *Gore*, the important federal judicial role in reviewing state-court decisions about state law in a federal Presidential election "does not imply a disrespect for state *courts* but rather a respect for the constitutionally prescribed role of state *legislatures*. To attach definitive weight to the pronouncement of a state court, when the very question at issue is whether the court has actually departed from the statutory meaning, would be to abdicate our responsibility to enforce the explicit requirements of Article II." *Id.*, at 115.

The dissent here questions why the federal courts would have a role in that kind of case. *Post*, at 11, n. 6 (opinion of KAGAN, J.). The answer to that question, as the unanimous Court stated in *Bush* v. *Palm Beach County Canvassing Bd.*, and as Chief Justice Rehnquist persuasively explained in *Bush* v. *Gore*, is that the text of the Constitution requires federal courts to ensure that state courts do not rewrite state election laws.

of open-ended balancing test in this case. But even on its own terms, the dissent's balancing analysis is faulty, in my respectful view.

Start by considering the implications of the dissent's analysis. In reinstating the District Court's order extending Wisconsin's deadline for receipt of absentee ballots, the dissent's approach would necessarily invalidate (or at least call into question) the laws of approximately 30 States for the upcoming election and compel all of those States to accept absentee ballots received after election day. The dissent's *de facto* green light to federal courts to rewrite dozens of state election laws around the country over the next two weeks seems to be rooted in a belief that federal judges know better than state legislators about how to run elections during a pandemic. But over the last several months, this Court has consistently rejected that federal-judges-know-best vision of election administration.

The dissent does not fully come to grips with the destabilizing consequences of its analysis, saying that the facts may differ in other States. But the key facts underlying the District Court's injunction are similar in other States: the existence of the virus and its effects on election workers, voters, mail systems, and in-person voting. The dissent's claim that its reasoning would not necessarily invalidate the absentee-ballot deadlines of approximately 30 other States therefore rings hollow.

Turning to the dissent's balancing analysis, the dissent does not sufficiently appreciate the necessity of deadlines in elections, and does not sufficiently account for all the steps that Wisconsin has already taken to help voters meet those deadlines.

The dissent claims that the State's election-day deadline for receipt of absentee ballots will "disenfranchise" some Wisconsin voters. But that is not what a reasonable election deadline does. This Court has long explained that a State's election deadline does not disenfranchise voters who

are capable of meeting the deadline but fail to do so. See *Rosario*, 410 U. S., at 757–758. In other words, reasonable election deadlines do not "disenfranchise" anyone under any legitimate understanding of that term. And the dissent cannot plausibly argue that the absentee-ballot deadline imposed—and still in place as of today—in most of the States is not a reasonable one. Those voters who disregard the deadlines or who fail to take the state-prescribed steps for meeting the deadlines may have to vote in person. But no one is disenfranchised by Wisconsin's reasonable and commonplace deadline for receiving absentee ballots. Indeed, more than *one million* Wisconsin voters have already requested, received, *and returned* their absentee ballots.

To help voters meet the deadlines, Wisconsin makes it easy to vote absentee and has taken several extraordinary steps this year to inform voters that they should request and return absentee ballots well before election day.

For starters, as the Seventh Circuit aptly noted, Wisconsin has "lots of rules" that "make voting easier than do the rules of many other states." *Luft* v. *Evers*, 963 F. 3d 665, 672 (2020). Wisconsin law allows voters to vote absentee without an excuse, no questions asked. Wis. Stat. §6.85 (2017–2018). Registered voters may request an absentee ballot by mail, e-mail, online, or fax. Wisconsin Elections Commission, Absentee Voting, https://elections.wi.gov/voters/absentee.

Since August, moreover, the Wisconsin Elections Commission has been regularly reminding voters of the need to act early so as to avoid backlogs and potential mail delays. See, *e.g.,* Wisconsin Elections Commission, Wisconsin Voting Deadlines and Facts for November 2020 (Aug. 20, 2020), http://elections.wi.gov/node/7039. In August and September, for example, Wisconsin's chief elections official explicitly urged voters not to wait to request a ballot: "It takes time for Wisconsin clerks to process your request. Then it may take up to seven days for you to receive your ballot in

the mail.  It can then take another seven days for your ballot to be returned by mail."  Wisconsin Elections Commission, Wisconsin Mails Voting Information to Registered Voters (Sept. 3, 2020), http://elections.wi.gov/node/7077.

Perhaps most importantly, in early September, Wisconsin decided to leave little to chance and mailed every registered voter in the State who had not already requested an absentee ballot (2.6 million of Wisconsin's registered voters) an absentee ballot application, as well as information about how to vote absentee.  *Ibid.*

Returning an absentee ballot in Wisconsin is also easy. To begin with, voters can return their completed absentee ballots by mail.  But absentee voters who do not want to rely on the mail have several other options.  Until election day, voters may, for example, hand-deliver their absentee ballots to the municipal clerk's office or other designated site, or they may place their absentee ballots in a secure absentee ballot drop box.  Some absentee ballot drop boxes are located outdoors, either for drive-through or walk-up access, and some are indoors at a location like a municipal clerk's office.  Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, et al. to All Wisconsin Election Officials (Aug. 19, 2020) (online source archived at www.supremecourt.gov).  The Wisconsin Elections Commission has made federal grant money available to local municipalities to purchase additional absentee ballot drop boxes to accommodate expanded absentee voting.

Alternatively, absentee voters may vote "in-person absentee" beginning two weeks before election day. Wis. Stat. §6.86(1)(b).  A Wisconsin voter who votes "in-person absentee" fills out an absentee ballot in person at a municipal clerk's office or other designated location before election day.  Some municipalities have created drive-up absentee voting sites to allow voters to vote "in-person absentee" without leaving their cars.  See, *e.g.,* City of Madison Clerk's Office, In-Person Absentee Voting Hours and Locations

(online source archived at www.supremecourt.gov).

Finally, on election day, a voter may drop off an absentee ballot at a polling place until 8:00 p.m. Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, to Wisconsin Municipal Clerks (Mar. 31, 2020) (online source archived at www.supremecourt.gov).

In sum, as the Governor of Wisconsin correctly said back in March as the COVID–19 crisis broke: "The good news is that absentee voting in Wisconsin is really easy." Marley, The Deadline to Request an Absentee Ballot in Wisconsin Is Friday. Here's How You Do It., Milwaukee Journal Sentinel, Mar. 13, 2020 (online source archived at www.supremecourt.gov).

The current statistics for the November election bear out the Governor's statement that absentee voting in Wisconsin is "really easy." In huge and unprecedented numbers, Wisconsin voters have already taken advantage of the State's generous absentee voting procedures for the November election. As of October 26, 2020, the Wisconsin Elections Commission has mailed 1,706,771 absentee ballots to Wisconsin voters. And it has already received back from voters 1,344,535 completed absentee ballots. Wisconsin Elections Commission, Absentee Ballot Report—November 3, 2020 General Election (Oct. 26, 2020), https://elections.wi.gov/node/7207.

As those statistics suggest, the dissent's charge that Wisconsin has disenfranchised absentee voters is not tenable. As the Seventh Circuit explained, the "district court did not find that any person who wants to avoid voting in person on Election Day would be unable to cast a ballot in Wisconsin by planning ahead and taking advantage of the opportunities allowed by state law." *Bostelmann*, ___ F. 3d, at ___.

The dissent insists, however, that "tens of thousands" and perhaps even 100,000 votes will not be counted if we do not reinstate the District Court's extension of the deadline. *Post*, at 3 (opinion of KAGAN, J.). The District Court arrived

at the same prediction, but it was a prediction, not a finding of fact.  Indeed, the District Court did not include this prediction in the facts section of its opinion.  *Democratic National Committee* v. *Bostelmann*, ___ F. Supp. 3d ___, ___ (WD Wis., Sept. 21, 2020).  For its part, the dissent makes the same prediction by looking at the number of absentee ballots that arrived after the primary election day in April.  But in the April primary, the received-by deadline had been extended to allow receipt of absentee ballots after election day.  The dissent's statistic tells us nothing about how many voters might miss the deadline when voters know that the ballots must be received by election day.  To take an analogy: How many people would file their taxes after April 15 if the filing deadline were changed to April 21?  Lots.  That fact tells us nothing about how many people would file their taxes after April 15 if the deadline remained at April 15.

The dissent also seizes on the fact that Wisconsin law allows voters to request absentee ballots until October 29, five days before election day.  But the dissent does not grapple with the good reason why the State allows such late requests.  The State allows those late requests for ballots because it wants to accommodate late requesters who still want to obtain an absentee ballot so that they can drop it off in person and avoid lines at the polls on election day.  No one thinks that voters who request absentee ballots as late as October 29 can both receive the ballots and *mail* them back in time to be received by election day.  As we stated in April, "even in an ordinary election, voters who request an absentee ballot at the deadline for requesting ballots . . . will usually receive their ballots on the day before or day of the election."  *RNC*, 589 U. S., at ___ (slip op., at 3).  Rather, those late requesters would, after receiving the ballots, necessarily have to drop their absentee ballots off in person at one of the designated locations.  In short, Wisconsin provides an option to request absentee ballots until October 29

for voters who decide relatively late in the game that they would prefer to avoid lines at the polls on election day.

The dissent's October 29-based argument falls short for another reason as well: The dissent's approach would actually penalize Wisconsin for being too generous with its absentee voting regime. Under the dissent's theory, if Wisconsin had just set a *more restrictive* deadline for voters to request absentee ballots—say, two weeks before election day—there presumably would not be a constitutional problem with the State's election-day deadline for receipt of absentee ballots. But it makes little sense to penalize Wisconsin for accommodating voters and making it easier for them to vote absentee and avoid lines on election day.

The dissent's rhetoric of "disenfranchisement" is misplaced for still another reason. As the dissent uses that term, the dissent's own position would itself "disenfranchise" voters. What about voters who request an absentee ballot after October 29? What about voters who mail their ballots after November 3? What about voters who mail their ballots by November 3 but whose ballots arrive after November 9? Even if we reinstated the District Court's order as the dissent would have us do, those votes would not count. The dissent's position would itself therefore "disenfranchise" some voters, at least as the dissent uses the term. All of which simply shows that the dissent's rhetoric of disenfranchisement is mistaken.

The dissent responds that I am just disagreeing with the facts found by the District Court. Not so. I do not disagree with any of the relevant historical facts that the District Court found and that the dissent highlights. The dissent, for example, calls attention to the District Court's finding that nearly two million Wisconsin voters in this election are likely to request mail ballots. I agree. Indeed, the Wisconsin Elections Commission has already sent nearly that number of absentee ballots to voters who have requested

them. The dissent notes that the influx of ballots has imposed a serious burden on some local election offices. I agree. The dissent points out that the District Court found that ballots can sometimes take two weeks to be sent and returned in light of Postal Service delays. I agree. The dissent highlights that the pandemic has gotten worse, not better, in Wisconsin over the last few weeks. I agree. And the dissent notes that the in-person voting option can pose a health risk to elderly and ill voters. I agree; I am fully aware of and sensitive to that reality.

Contrary to the dissent's attempt to characterize our disagreement as factual, the facts in this case are largely undisputed. I have zero disagreement with the dissent on the question of whether COVID–19 is a serious problem. It is. Instead, I disagree with some of the District Court's and the dissent's speculative predictions about how the voting process might unfold with an election-day deadline for receipt of absentee ballots. And I disagree with the District Court's and the dissent's legal analysis of whether, given the agreed-upon facts, the State has done enough to protect the right to vote under the Constitution and this Court's precedents, given the necessity of having election deadlines.

In short, I agree with the dissent that COVID–19 is a serious problem. But you need deadlines to hold elections—there is just no wishing away or getting around that fundamental point. And Wisconsin's deadline is the same as that in 30 other States and is a reasonable deadline given all the circumstances.

To be clear, in every election a voter who requests an absentee ballot, particularly a voter who waits until the last moments to request an absentee ballot, might not receive a ballot in time to mail it back in, or in some cases may not receive a ballot until after election day. Or in some cases, a voter may mail a completed ballot, but it may get delayed

and arrive too late to be counted.[2]  Indeed, in 2012 and 2016, the States rejected more than 70,000 ballots in each election because the ballots missed the deadlines.  U. S. Election Assistance Commission, 2012 Election Administration and Voting Survey 42 (2013); U. S. Election Assistance Commission, 2016 Election Administration and Voting Survey 11, 25 (2017).  But moving a deadline would not prevent ballots from arriving after the newly minted deadline any more than moving first base would mean no more close plays.  And more to the point, the fact that some ballots will be late in any system with deadlines does not make Wisconsin's widely used deadline facially unconstitutional.  See *Crawford*, 553 U. S., at 202–203.

Put another way, the relevant question is not whether any voter would ever miss the deadlines.  After all, in every deadline case, the answer would always be yes, and no election deadline would ever be permissible.  The proper question under the Constitution is whether the deadline is reasonable under the circumstances.  See *Rosario*, 410 U. S., at 760.  Again, Wisconsin's deadline is the same as that in about 30 other States for the November election and is reasonable, for the reasons I have explained.

In any event, if a Wisconsin voter does not receive an absentee ballot in time to cast it, the voter still has the option of voting in person.  And Wisconsin, like many other States, demonstrated in the April and August primary elections that it can run an in-person election in a way that is reasonably safe for Wisconsin voters, with socially distanced

———————

[2] In Wisconsin, a voter can track his or her ballot online.  MyVote Wisconsin, Track My Ballot, https://myvote.wi.gov/en-us/TrackMyBallot.  If a voter is concerned that the ballot may not be received in time, the voter can cancel the absentee ballot and request a new one or vote in person, as long as the voter meets the deadlines set by the municipality for doing so, which typically fall a few days before election day.  Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, to Wisconsin County Clerks et al. (Oct. 19, 2020) (online source archived at www.supremecourt.gov).

lines, mask requirements, and sanitizing protocols. The
District Court acknowledged that in-person voting can be
done "safely" again in November "if the majority of votes
are cast in advance, sufficient poll workers, polling places,
and PPE are available, and social distancing and masking
protocols are followed." *Bostelmann*, ___ F. Supp. 3d, at
___. If a voter requests a ballot at the last minute—long
after the State has told voters that they should request bal-
lots—and if that voter does not receive a ballot by election
day, the voter still has the option of voting in person. That
said, the better option, as Wisconsin has repeatedly an-
nounced, is for voters who wish to vote absentee to request
and submit their ballots well ahead of time. That is what
tens of millions of voters across America—including more
than one million voters in Wisconsin—have already done.

*      *      *

For those reasons, I concur in the denial of the applica-
tions to vacate the stay.